CARLIE CHRISTENSEN, United States Attorney (#633)
DANIEL R. STRONG, Special Assistant United States Attorney (#13614)
Attorneys for the United States of America
185 South State Street, Suite 300
Salt Lake City, Utah 84111
Telephone:    (801) 524-5682

_____

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION
_____

| | |
|---|---|
| | : |
| UNITED STATES OF AMERICA, | : Case No. 2:15-CR-00166 DB |
| | : |
| Plaintiff, | : MOTION IN LIMINE TO EXCLUDE |
| | : ENTRAPMENT DEFENSE, NOTICE OF |
| vs. | : INTENT TO ADMIT PREDISPOSITION |
| | : EVIDENCE IF ENTRAPMENT |
| | : DEFENSE IS ALLOWED, AND |
| STEPHEN LAWRENCE DEAN, | : REQUEST FOR HEARING. |
| | : |
| Defendant. | : |
| | Honorable Dee Benson |

_____

The United States Attorney, by and through the undersigned Special Assistant

United States Attorney, moves the Court to a exclude any defense of entrapment in this

case, because no reasonable jury could find the defendant was entrapped. If the Court

agrees an entrapment defense should not be put before the jury, the United States asks the

Court to preclude the defendant from informally suggesting entrapment elements or

presenting what has been described by other courts as a "backhanded" entrapment

defense. Finally, if the Court decides at any point to allow an entrapment defense to be

presented to the jury, the United States gives notice of its intent to admit evidence that the

defendant was predisposed to commit the offense and moves the Court to admit such evidence. The United States requests a pretrial hearing to address these issues.

## FACTUAL BACKGROUND[1]

The defendant is charged by indictment with one count of being a felon in possession of firearms and ammunition. A jury trial is currently set for June 29, 2015. The United States intends to present evidence that the defendant fired two firearms, a Belknap 12-gauge shotgun and a Rockriver LAR-15 rifle, on December 5, 2014, at a homemade shooting range on land near Delta, Utah, where the defendant keeps his bus and sometimes resides. The United States will rely, in part, on testimony and recordings from an undercover FBI agent ("UC") who met with the defendant on four occasions, including the day of the alleged crime.

The UC will testify that he brought the LAR-15 rifle to the range, at the defendant's request, to demonstrate how it could help the defendant take out coyotes that had been attacking the defendant's goats. The defendant fired several rounds from the LAR-15 at targets that the defendant provided. The shotgun was brought by the defendant's friend, Daniel Jensen, who lives in the defendant's bus. Daniel Jensen handed the shotgun to the defendant without any action on the part of the UC. The defendant fired several rounds from the shotgun at clay discs thrown by the UC.

During the first week of May, 2015, the Court and the United States received letters from apparent associates of the defendant. One of the letters, titled "Petition for

---

1  These facts represent the United States' proffer of evidence it will present at trial.

Habeas Corpus," included allegations that the FBI agent "set up a scam for entrapment." The defendant has since moved, through his appointed counsel, to strike these documents from the docket and prevent further filings by non-parties. Nonetheless, the United States believes the defendant may attempt to argue he was entrapped by the government in this case.

The United States possesses extensive evidence that the defendant was predisposed to commit the offense charged.

Predisposition evidence[2]

The defendant has a prior federal conviction for being a felon in possession of ammunition in case no. 2:09-cr-285. He plead guilty to the offense on May 17, 2010. In his statement in advance of the guilty plea, the defendant admitted that he possessed ammunition in his earlobes, after having been convicted of a felony in 1999. On August 5, 2010, the defendant was sentenced to serve twelve months and one day in custody of the bureau of prisons. At sentencing, the United States explained that it opted to file federal charges in this matter because the offense was a "blatant violation of law." The defendant had worn bullets in his ears while meeting with his probation officer for the prior felony. Additionally, the defendant had a document with him from a fictitious court that he claimed allowed him to possess firearms.

On October 14, 2010, after he was sentenced, the defendant filed a document titled

_____

2  Much of this evidence will only become relevant or admissible if the issue of entrapment is raised. Some of this evidence, however, is relevant to showing the defendant's knowledge or intent to commit the crime charged. The United States may also seek to admit some of this evidence for that purpose, regardless of whether entrapment is argued.

"Affidavit of Truth, Notice to Conditional Acceptance." In that document, the defendant wrote:

> The right to keep and bear arms, including ammunition, is a God-given right, protected and guaranteed by the Bill of Rights and the Constitution, and as such, the only one who can take that right away from Affiant is God and no one else.

The defendant also demonstrated his predisposition to possessing firearms several times during the UC's recorded meetings with him in this case. The defendant mentioned several times that he is the leader of a militia group called the "People's United Mobile Armed Services," or PUMAS. The defendant claimed that the "arms" he was referring to were his guitar and his didgeridoo, but he also admitted that if the government did not capitulate to his demands, "we're gonna call in the militia and we're gonna arrest them at the county level."

When discussing his prior conviction for being a felon in possession of ammunition with the UC, the defendant stated:

> During probation, I said 'you guys can't take away my second amendment rights. It says that right shall not be infringed . . . I'm a 2nd Amendment advocate. I'm part of the People's United Mobile Armed Services. It's a Utah militia. I am not armed, but I'm armed with my music, my didgeridoo . . . I'm the lead state coordinator for the National Liberty alliance. We're forming common law grand juries. We're gonna make it to where, you know, hey, if you're a felon but you've done your time and you've paid your debt to society, there's no reason you can't have a firearm to protect yourself.

The defendant went on to add:

> We've got 'em very concerned now. We're filing common law grand juries to get into the actual courtrooms, the jury rooms, to get the keys to the

buildings. We're coming. We're kind of dividing law enforcement right now, and the more we get in there, the more they realize, 'these guys are the real deal.' So they gotta make a choice, either they honor their oath or we'll arrest them.

The defendant also discussed his actions at the Bundy Ranch protest in Nevada. He said, "I went down there, I told 'em, 'I'm militia from Utah.' They didn't know I wasn't armed. I was acting like I was." He then showed the UC a cap gun he carried at the Bundy Ranch to make it appear as if he was armed.

The defendant also discussed a case he had pending in the Delta City Justice Court. He told the UC that when he appeared in court, he threatened to the arrest the judge. "I said, 'I think you're violating your oath of office. I think we might need to arrest you here today . . . I turned around and asked 'Are there any oath keepers in the room?"

The defendant mentioned a number of times that coyotes had been attacking his goats on the property in Delta, Utah. He stated his friend, Daniel, who lives on the property in the defendant's bus, "has a shotgun," but "needs a good rifle." He stated that Daniel could "get a rifle with a scope on it, get on top of my bus, and take care of it." The UC will also testify that the defendant requested the UC come to the property to shoot and to bring his rifle.

In their first visit to the Delta, Utah property on November 7, 2014, the defendant stated, "You gotta be on your guard out here, because people out here know no one is out here. Law enforcement is hours away." When asked if it was legal to fire guns on the property, the defendant responded, "Yeah." The defendant also mentioned that he had "a

target set up by the tree of life."

Finally, during their drive back to the property on December 4, 2015, the defendant asked for directions to a sporting goods store in order to purchase ammunition for the shooting range. The defendant went into the store with the UC and suggested they purchase various items to attract the coyotes. During the same drive, the defendant discussed his belief that the Sandy Hook shooting was a hoax perpetrated by the government in order to take the people's guns away. When they arrived at the property, the UC and Daniel Jensen discussed setting up targets for the shooting range. Mr. Jensen stated, "they're Steve's targets.'" The UC then asked if they could use the defendant's targets, and the defendant stated, "Have at it." Mr. Jensen also brought a shooting table out of the bus, which he said was the defendant's. The defendant later stated he got the shooting table from his father.

On December 5, 2015, the defendant fired both the rifle and the shotgun for several minutes each. He said "Wow," upon taking possession of the rifle. He fired the guns from a homemade shooting range on top of his bus. Afterwards, the defendant posted a photograph of the homemade shooting range on his Facebook page.

That same Facebook page lists the defendant's occupation as "exposing evil, fighting tyranny with guns and lasers and stuff."

## ARGUMENT

**I.      THE COURT SHOULD PRECLUDE THE DEFENDANT FROM RAISING ENTRAPMENT, AS A MATTER OF LAW, BECAUSE NO REASONABLE JURY COULD FIND ENTRAPMENT FROM THE AVAILABLE EVIDENCE.**

"The purpose underlying the entrapment defense is to protect an otherwise unpredisposed individual from government coercion." *United States v. Dozal-Bencomo,* 952. F.2d. 1246. Entrapment is "a relatively limited defense." *United States v. Russell,* 411 U.S. 423, 435 (1973). The defense has two elements; first, government agents must have induced the defendant to commit the offense; and second, the defendant must not have been otherwise predisposed to commit the offense, given the opportunity. *See United States v. Fadel,* 844 F.2d 1425, 1429 (10th Cir. 1988) (citing *Mathews v. United States,* 485 U.S. 58, 65 (1988)).

The Supreme Court has stated that "the question of entrapment is *generally* one for the jury." *Mathews, supra,* 485 U.S. at 65 (1988). A court may conclude, however, that entrapment did or did not exist as a matter of law. *See United State v. Ortiz*, 804 F.2d 1161, 1164 (10th Cir. 1986); *See also United States v. Santiago-Godinez*, 12 F.3d 722, 730 (7th Cir. 1993) (Where evidence proffered by defendant was insufficient "as a matter of law to support an affirmative defense, a pretrial ruling precluding the defense at trial may be appropriate."). A court may find entrapment as a matter of law if uncontradicted evidence satisfies the elements of entrapment. *See id*. Conversely, "it also may conclude, as a matter of law, that the evidence [of entrapment] is insufficient to create a triable issue." *See id*.

7

"Thus, whether there is evidence sufficient to constitute a triable issue of entrapment is a question of law." *See id*. (citing *United States v. Reyes*, 645 F.2d 285, 287 (5th Cir. 1981)).

To meet this evidentiary threshold, there must be "a foundation in the evidence in the light viewed most favorably to the accused." *See id*. "The defendant must point to evidence of *both* lack of predisposition and government inducement before the trial judge can determine whether entrapment has been shown sufficiently to present it to the jury." *See id.* at 1165, citing *United States v. Nations*, 764 F.2d 1073, 1079 (5th Cir. 1985) (emphasis added); *See also United States v. Sullivan,* 919 F.2d 1403, 1418 (10th Cir. 1990). "The defendant is entitled to present an entrapment defense to the jury only if he can identify evidence from which a reasonable juror could derive a reasonable doubt as to the origin of [the defendant's] criminal intent." *See Ortiz, supra,* 804 F.2d at 1164; *See also Sullivan*, *supra* 919 F.2d at 18 (The evidence of entrapment must be sufficient to establish "a genuine issue concerning the origin of criminal intent."). Only after "a credible entrapment defense is raised, [does] the prosecution [have] the burden of proving, beyond a reasonable doubt, that the defendant was not entrapped." *Id.*, citing *United States v. Young*, 954 F.2d 614, 616 (10th Cir. 1992).

The United States asks the Court to prohibit the defendant from raising the issue of entrapment until the defendant can point to evidence sufficient to meet the evidentiary threshold on both elements of entrapment. The United States contends the defendant cannot show a genuine issue of fact as to either element. There is overwhelming evidence the defendant was predisposed to commit the offense, and no evidence that the government

improperly induced his criminal conduct.

> **a. There is overwhelming evidence that the defendant was predisposed to possessing firearms and ammunition as a felon.**

Predisposition is "a defendant's inclination to engage in the illegal activity for which he has been charged, i.e. that he is ready and willing to commit the crime." *See United States v. Nguyen,* 413 F.2d 1170, 1178 (10th Cir. 2005). Courts have described lack of predisposition as "the crux" and "the principal element" of an entrapment defense. *See Fadel, supra,* 844 F.2d at 1429; *See also Mathews, supra,* 485 U.S. at 63. "The critical inquiry in entrapment, therefore, focuses on the defendant's intent or predisposition to commit the offense rather than the degree of government involvement." *United States v. Dozal-Bencomo,* 952 F.2d 1246, 1250 (10th Cir. 1991). If there is "sufficient evidence that the defendant was predisposed to commit the crime, . . . the entrapment defense is properly rejected without an inquiry into government inducement" *See United States v. Santiago-Gomez*, 12 F.3d 722, 728 (7th Cir. 1993).

Predisposition may be shown "by evidence of similar prior illegal acts" or inferred "from defendant's . . . eagerness to participate in the transaction, his ready response to the government's inducement offer, or his demonstrated knowledge or experience in the criminal activity." *See Nguyen, supra,* 413 F.3d at 1178, citing *United States v. Duran*, 133 F.3d. 1324, 1335 (10th Cir. 1998). The defendant's predisposition is viewed at the time the government agent first approaches the defendant, but "inference about that predisposition may be drawn from events occurring after the two parties came into

contact." *See United States v. Garcia,* 182 F.3d 1165, 1169 (10th Cir. 1999).

Here, there is overwhelming evidence demonstrating the defendant's predisposition for possessing firearms and ammunition as a felon. First, there is substantial "evidence of similar prior illegal acts." *See Nguyen, supra,* 413 F.3d at 1178. The defendant has a prior conviction under the same statute charged here. In that case, he demonstrated blatant disregard for federal firearm restrictions on felons. He committed the offense while still on probation for his original felony. He wore bullets in his earlobes during his meeting with his probation officer and submitted a document claiming a fictitious court granted him permission to do so. After being sentenced by a federal judge for that offense, he continued to show his disregard for the government's authority to prohibit him from possessing firearms by filing a document stating that "only God" could take that his 2nd Amendment rights away from him.

The defendant repeated this belief multiple times during conversations with the UC in this case. He stated that his group, the National Liberty Alliance, was taking over courts in part to establish that felons could still possess firearms after they have served their time. The defendant stated, "you can't take away my second amendment rights."

Second, the defendant's "demonstrated knowledge or experience in [this type of] criminal activity" shows his predisposition to possessing firearms. *See id.* The defendant is head of a self-described militia group called the "People's United Mobile Armed Services." He described plans to use his militia to arrest public officials whom he believes are not complying with their oaths. Although he never expressly threatened to

use firearms to make these arrests—and he claimed the term "armed" in the title is used broadly enough to encompass musical instruments—it is difficult to imagine how his militia could affect such a plan without using firearms. Indeed, his own Facebook page states that his occupation is fighting tyranny "with guns and lazers and stuff."

Furthermore, the defendant displayed his desire to act as part of an armed militia by claiming to be exactly that while demonstrating at the Bundy Ranch protest. He admitted to the UC that he told the Bundys he was part of a "Utah militia," and that he carried around a cap gun in order to appear armed.

Finally the defendant also demonstrated his predisposition by his "ready response to the government's offer" in this case. *See id*. The UC will testify that the defendant invited the UC to his property to fire his rifle. Audio recordings will show that the defendant asked for directions to a sporting goods store where they could purchase rounds for the shooting trip. Video recordings will show that the defendant already possessed shooting targets in his bus that he eagerly provided for use in the homemade rifle range. The defendant also provided a shooting table for the range that he admitted belonged to him. When provided an opportunity to fire both guns, the defendant quickly took it. He fired both for several minutes, never showing any hesitation. After he shot the firearms, he posted photos of the range on his Facebook page, which suggests that he did not regret the decision.

There is overwhelming evidence that the defendant was predisposed to possessing firearms. While some of this evidence may be admissible during the United States'

11

case-in-chief, much of the predisposition evidence only becomes relevant to combat an entrapment defense. The defendant, however, should not be allowed to raise an entrapment defense until the Court finds there is a genuine issue of fact as to whether he was predisposed.

      **b.  There is no evidence to suggest the government induced the defendant to possess a firearm.**

"Inducement is government conduct which creates a substantial risk that an undisposed person or otherwise law-abiding citizen would commit the offense." *See Nguyen*, *supra*, 413 F.3d at 1178. Evidence that "a government agent solicited, requested, or approached the defendant to engage in criminal conduct, standing alone, is insufficient to constitute inducement." *See id.*, citing *Ortiz, supra*, 804 F.2d at 1165. Furthermore, inducement "will not be shown by evidence that the government agent initiated the contact with the defendant or proposed the crime." *See id.* In contrast, inducement "may take the form of persuasion, fraudulent representations, threats, coercive tactics, harassment, promises of reward, or please based on need, sympathy, or friendship." *See Ortiz*, *supra*, 804 F.2d at 1165; *See also United States v. Scull*, 321 F.3d 1270, 1275.

In *United States v. Teleguz*, 492 F.3d 80 (1st Cir. 2007), a defendant charged with possessing firearms with obliterated serial numbers attempted to raise an entrapment defense. He presented the following evidence of inducement: that the government agent had first approached him and his co-defendants about purchasing firearms, that the agent had befriended the defendant and co-defendants, that the agent pressed hard to get a

12

number of weapons from the co-defendants, and to get them quickly, and that the agent made up stories about why he needed the weapons quickly. *See id.* at 85. The district court refused to give an entrapment instruction as a matter of law. The First Circuit, applying *de novo* review, affirmed. "No reasonable jury could conclude there was any improper government inducement." *See id.* at 84. The court explained the government must do more than just create an opportunity for the offense. *See id.* The court explained that "government manipulation" and "dogged insistence" do not necessarily constitute improper inducement if the government is merely providing "an opportunity to commit a crime." *See id.* Furthermore, "sting operations ordinarily do not involve improper inducement," even though "they often involved government manipulation, solicitation, and at times, deceit." *See id.* at 85.

In contrast, the court cited *United States v. Joost*, 92. F.3d 7, 12-14, in which the First Circuit held "that [the] defendant was entitled to [an] entrapment instruction where the jury could have found . . . [the] defendant resisted agents' requests, [the] defendant employed a general strategy of deflecting agents' requests, agents deliberately created a financial dependency, and agents threatened defendants' continued income." *See Teleguz, supra,* 492. F.3d. at 86, citing *Joost*, *supra*, 92 F.3d at 12-14.

Here, the evidence will show the UC did not induce the defendant's criminal behavior. The UC did nothing more than create an opportunity for the defendant to possess firearms. There is no evidence that the UC offered any financial incentives or exerted any pressure on the defendant to possess firearms. The UC engaged in a sting operation by

13

befriending the defendant and offering to shoot firearms with him. The UC helped create

an opportunity for the defendant to commit the offense, but this does not amount to

inducement sufficient to raise an entrapment defense. Nothing the UC did would create "a

substantial risk than an undisposed person or otherwise law-abiding citizen would

commit the offense." *See Nguyen*, *supra*, 413 F.3d at 1178. Until the defendant can point

to contrary evidence sufficient to create a genuine issue of fact, he should not be allowed

to raise an entrapment defense.

## II.   IF THE COURT FINDS SUFFICIENT EVIDENCE TO ALLOW THE DEFENDANT TO RAISE AN ENTRAPMENT DEFENSE, IT SHOULD ALSO ADMIT PREDISPOSITION EVIDENCE, INCLUDING THE DEFENDANT'S PRIOR OFFENSE CONDUCT.

If the court finds sufficient conflicting evidence to create a genuine issue of fact

regarding both elements of entrapment, "the question of entrapment should be submitted to

the jury."   *See Sullivan*, *supra*, 919 F.2d at 1418. The United States would then have the

burden of proving, beyond a reasonable doubt, that the defendant was not entrapped. *See*

*Young*, *supra*, 954 F.2d at 616. As a lack of predisposition to commit the offense is "the

principal element" of an entrapment defense, the United States would be required to

present evidence of the defendant's predisposition in order to meet its burden. *See*

*Mathews, supra,* 485 U.S. at 63. Evidence that a defendant was predisposed to commit a

crime "may derive from direct proof the individual previously engaged in the illegal

activity," from "his inclination, willingness, or readiness to engage in the illegal activity,"

or from "his demonstrated knowledge or experience in the criminal activity under

14

investigation." *See United States v. Mendoza-Salgado*, 964 F.2d 1993, 1002-03 (10th Cir. 1992.); *See also Duran*, *supra*, 133 F.3d at 1335 (quoting *Dozal–Bencomo*, *supra*, 952 F.2d at 1251.)

Therefore, if the Court allows the defendant to present an entrapment defense to the jury, the United States moves the court to allow evidence of the defendant's predisposition to possess firearms and ammunition as a felon. This evidence would include not just the fact of his prior conviction, but "direct proof" of his predisposition from the prior case, including the documents the defendant presented that showed his "willingness or readiness" to possess firearms as a felon. *See id.* The United States would also seek to admit statements the defendant made discussing his militia and his plans to affect the arrest of judges and other public officials, as these plans further demonstrate his purpose and inclination toward possessing firearms.

## III.   IF THE COURT EXCLUDES AN ENTRAPMENT DEFENSE, IT SHOULD ALSO PRECLUDE THE DEFENDANT FROM ALLUDING TO ENTRAPMENT OR PRESENTING A "BACKHANDED" ENTRAPMENT DEFENSE.

By raising an entrapment defense, a defendant endures some cost, as the defense places his predisposition to commit the crime, including similar prior bad acts, at issue. *See United States v. Mendoza-Salgado*, 964 F.2d 1993, 1002-03 (10th Cir. 1992.); *See also Duran*, *supra*, 133 F.3d at 1335 (quoting *Dozal–Bencomo*, *supra*, 952 F.2d at 1251.) In order to avoid paying this cost, defendants have attempted to informally raise the issue of entrapment through questioning and argument, without formally pleading entrapment or

requesting a jury instruction on it. Courts have recognized the inherent unfairness of such a result.

In *United States v. Levin*, 606 F.2d 47 (3rd Cir. 1979), a defendant appealed his conviction, arguing that the trial court had erred by failing to give an entrapment instruction and by instructing the jury that "entrapment was not at issue" in response to a question during deliberations. *See id*. at 48-49. The defendant argued the jury could properly consider entrapment, because his attorney had alluded to the issue through questioning and in his opening statement, even though the defendant had never formally claimed entrapment as a defense. *See id*. The Third Circuit disagreed, recognizing the "danger inherent in permitting a defendant to raise the possibility of entrapment in the minds of jurors . . . without requiring him to put the question at issue." *See id*. at 49. If such a procedure were allowed, "the defendant could effectively benefit from the entrapment defense without providing the prosecution with adequate notice for it to meet its burden" of proving the defendant were not entrapped. *See id*. at 49. The Third Circuit concluded that "a defendant is not entitled to an instruction on entrapment, unless he explicitly pleads, at a sufficiently early point in the trial, that he was entrapped." *See id*.

Of course, a clever defendant could attempt to circumvent even this limitation by suggesting entrapment to the jurors without ever requesting a formal jury instruction on it. In *United States v. Neuman*, 436 F.2d 285 (D.C. Cir. 1970), the D.C. Circuit recognized the unfairness of this approach. "Obviously . . . it would be unfair if defense counsel could both put the issue of entrapment before the jury through his questioning and still keep the

Government from presenting evidence of predisposition by declining formally to plead entrapment as a defense and by declining to request an entrapment instruction at the conclusion of the trial." *See id*. at 286-87. Therefore, the court ruled that "when defense counsel asks questions thought to be suggestive of entrapment, he should be instructed to plead the defense or abandon the line of questioning." *See id*.

Similarly in *United States v. Berry*, 644 F.2d 1034 (5th Cir. 1981), the Fifth Circuit affirmed a trial court's decision to prevent the defendant from raising what it characterized as a "backhanded" entrapment defense. There, the defendant attempted to cross-examine a government agent about efforts the agent had made to encourage the defendant to commit the crime. *See id*. at 1037-38. The defendant argued these questions were not intended to raise an entrapment defense, but merely to show his lack of willingness to deal firearms, which was an element of the offense charged. *See id*. The trial judge "warned the defendant that any testimony elicited concerning the agent's encouragement to commit the crime would open the door to entrapment and permit the government to introduce evidence of predisposition." *See id*. at 1037. The Fifth Circuit affirmed this admonishment, reasoning "the defendant is not merely defending against proof of willingness, but is presenting a defense of entrapment that permits the government the opportunity to rebut that defense with evidence of predisposition. *See id*. at 1037-38.

The United States moves the Court to similarly protect against such unfair tactics in this case. If the defendant at any point believes sufficient evidence is presented to justify putting entrapment before the jury, the issue should be presented formally, and with

sufficient clear notice for the United States to respond with evidence of predisposition. If evidence supporting both elements of entrapment never materializes, the Court should not allow an entrapment defense in any form, including "backhanded" attempts to informally suggest the defense to the jury.

### IV.   THE UNITED STATES SUGGESTS THE COURT HOLD A PRETRIAL HEARING TO DETERMINE IF THERE IS ANY EVIDENCE THAT WOULD CREATE AN ISSUE OF FACT REGARDING ENTRAPMENT.

Many courts have recognized entrapment as an area of the law that is "fraught with confusion." *See United States v. Burkley*, 591 F.2d 903, 913 (D.C. Cir. 1978)*; See also United States v. Cortes*, 732 F.3d, 1078, 1087 (9th Cir. 2013) ("Our decisions in this area have not been a model of clarity."). In this case, the logistical hurdles of addressing an entrapment defense are particularly daunting, because the predisposition evidence is substantial enough that admitting it would drastically change the presentation of evidence at trial. If predisposition is placed at issue, the United States would need to subpoena additional witnesses, obtain certified court documents, and prepare hours of recordings for transcription. Indeed, the sheer volume of predisposition evidence at issue is the primary reason the United States' believe no reasonable juror could find entrapment here. Yet much of that evidence does not become relevant until an entrapment defense is raised. Therefore, the United States is in the borderline-paradoxical position of asking this Court to make a ruling on the appropriateness of an entrapment defense, based in part on evidence the Court will be unlikely to hear unless an entrapment defense is raised.

The United States suggests the Court hold a pretrial hearing to untangle this

18

complicated procedural web. In *United States v. Santiago-Godinez*, 12 F.3d 722 (7th Cir. 1993), the United States had filed a motion in limine to exclude an entrapment defense, and the district court held a pretrial hearing asking the defendant to present any evidence, by proffer, that if believed would show the elements of entrapment. *See id*. at 729-30. The defendant proffered that the government agent had approached the defendant and suggested the idea of purchasing drugs from him. *See id*. The defendant also proffered that the government agent offered a good deal of money in exchange for the drugs. *See id*. Addressing predisposition, the parties acknowledged by proffer that the defendant had dealt drugs on two prior occasions, once resulting in a conviction. *See id*. The district court determined, as a matter of law, that the proffered evidence did not create an issue of fact regarding entrapment. *See id*. The defendant was precluded from asserting an entrapment defense, so he plead guilty and later appealed the court's decision. *See id*.

The Seventh Circuit affirmed, holding "where the evidence proffered in response to a motion in limine raised by the government is insufficient as a matter of law to support the affirmative defense, a pretrial ruling precluding the presentation of the defense at trial may be appropriate." *See id*. at 727, (citing *Sherman v. United States*, 356 U.S. 369, 377 (1958). The court reasoned that the facts proffered by the defendant, even if believed, did not amount to creating an issue of fact as to both elements of entrapment, so the Court could properly preclude him from such a defense. *See id*. at 728-29.[3]

---

3 The court cautioned that the issue of entrapment is "generally . . . one for the jury," and pretrial determinations on whether entrapment can be raised are only appropriate in "limited circumstances." *See id*. Nonetheless, the court held the facts proffered at the pretrial hearing were deficient enough to warrant a pretrial ruling as a matter of law. *See id*.

A pretrial hearing on the issue of entrapment similar to the one in

*Santiago-Godinez*, would likely be productive in this case. If the defendant can proffer

evidence of entrapment that, if believed, would create a genuine issue of fact, the Court

could rule that entrapment may be at issue, and both parties can proceed at trial under that

assumption. Conversely, if the Court finds insufficient evidence of either entrapment

element and precludes an entrapment defense, it may cause the defendant to reassess his

chances at trial and abdicate the need to call in a jury at all.

## CONCLUSION

Therefore, for the foregoing reasons, the United States moves the Court to preclude

a defense of entrapment in this case. If a defense of entrapment is allowed, the United

States moves the Court to admit predisposition evidence. If a defense of entrapment is not

allowed, the United States moves the Court to also preclude a "backhanded" entrapment

defense. Finally, the United States suggests the Court hold a pretrial hearing to address

these issues.

Dated this 29th day of March, 2015.

CARLIE CHRISTENSEN
United States Attorney


*/s/ Daniel R. Strong*
DANIEL R. STRONG
Special Assistant United States Attorney